IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

**v.**                              **No. 16-CR-4572 MCA**

**WILLIAM DOUGLAS WARWICK,**

    **Defendant.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** is before the Court on *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 33] regarding a search that took place on November 7, 2016 and *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 34] regarding a search that took place on August 3, 2016. The Court has considered the evidence presented at hearing, the parties' submissions, and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS** *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 33] and **DENIES** *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 34]

**FINDINGS OF FACT**

1. Defendant is a 52 year-old man who graduated from high school and who describes himself as a "certified refrigeration man." [Doc. 81, 25:3-9]

2. Defendant has had prior encounters with law enforcement and knows his rights, including his right not to consent and his "right not to make statements." [Doc. 81, 61:11-22]

1

3. On August 3, 2016, law enforcement officers were searching for a fugitive, Shauna Gutierrez, who was indicted in a RICO case in April of 2016.  Ms. Gutierrez was also the wife or girlfriend of another defendant in the RICO case. Officers were seeking her to execute the arrest warrant.  [Doc. 75, 46:9-16 (Howard), 95:2-13 (Acee)]

4. On August 3, 2016, the law enforcement officers seeking Ms. Gutierrez received a tip that she was staying with Defendant.  [Doc. 75, 31:20 to 32:12 (Howard)]

5. Defendant met Ms. Gutierrez in mid-June, 2016, when she was hitchhiking in Los Lunas, and, because she did not have a place to stay, he let her live with him. [Doc. 81, 26:9 to 27:11]  Ms. Gutierrez told Defendant that her name was Sally Martinez.  [Doc. 81, 26:17-18]

6. Nine law enforcement officers went to Defendant's residence at 93 Cielo Azul in San Clemente, New Mexico, to arrest Ms. Gutierrez.  [Doc. 75, 31:20 to 32:6 (Howard)]  The officers arrived in three vehicles.  [Doc. 75, 68:3-7 (Salcido), 75, 95:11-22 (Acee)]

7. Officers participating in the search for and arrest of Ms. Gutierrez included: Special Agent Byran Acee with the FBI [Doc. 75, 95:11-18]; FBI Special Agent John Howard, [Doc. 75, 29:14-25, 31:20-25]; Matthew Salcido, a deportation officer with Immigration and Customs Enforcement, who is assigned to the FBI Safe Streets Task Force [Doc. 75, 66:16 to 67:8]; Task Force Officer Mark Myers [Doc. 75, 70:18-25]; Special Agent Sarah Rich [Doc. 75, 72:2-5]; Special Agent

Tom Neale [Doc. 75, 73:25]; Special Agent Joseph Sainato [Doc. 75, 68:13-17]; Task Force Officer Chris Cupit [Doc. 75, 99:6-8]; and one other unidentified officer.

8. According to Agent Howard, nine officers went to Defendant's residence because of the serious nature of the allegations in the RICO case and against Ms. Gutierrez, including murder and conspiracy to commit murder, and because Ms. Gutierrez could be with members of a prison gang. [Doc. 75, 31:20 to 32:6]

9. All of the law enforcement officers were wearing "RAID" vests. [Doc. 75, 69:14-16 (Salcido)]

10. Agent Howard diagramed the property at 93 Cielo Azul. [Doc. 75, 33:20 to 34:9; Government Exhibit (hereafter, GEX) 48] As shown on the diagram, the front door of the residence is on the left side of the page.[1] [Doc. 75, 36:11-23] The residence is a trailer. [Doc. 75, 35:6-8]

11. All officers arrived at the same time, one car parked toward the back of the property (on the right side of the page) and two cars parked toward the front of the property (on the left side of the page). [Doc. 75, 35:20 to 36:10 (Howard); GEX 2]

---

[1] Defendant submitted as an exhibit an aerial photograph of the property at 93 Cielo Azul. [Defendant's Exhibit (hereafter, DEX) A] There appears to be a discrepancy with regard to the cardinal directions between DEX A and GEX 48. If North is at the top of the page of the aerial photograph, then Agent Howard's diagram incorrectly shows what is generally East (or East Southeast) to be North, [GEX 48] hence, the Court has made an effort to avoid reference to the cardinal directions and rather refers to the left, top, etc. of each specific exhibit.

12. Agent Howard drew his weapon when he exited his vehicle and trained it on the residence. [Doc. 75, 38:11-17] He approached the trailer and focused his attention and weapon on two windows above the front door as depicted on the diagram. [Doc. 36:11 to 37:3]

13. Matthew Salcido, Joe Sainato and another agent approached the front door and knocked. [Doc. 75, 68:13 to 69:2]

14. Regarding the knock:

   a. Defendant described the knock as obnoxious, not casual, and stated that it alarmed or concerned him. [Doc. 81, 32:6-20]

   b. On the other hand, Agent Salcido testified "I don't knock hard." [Doc. 75, 83:3-4]

   c. The Court finds this discrepancy immaterial.

15. Defendant answered the door and stepped outside. [Doc. 75, 69:5-9 (Salcido); Doc. 81, 32:23 to 33:2 (Defendant)]

16. Regarding the encounter at the front door:

   a. Defendant testified that when he stepped outside he saw "[a] gun in my face, a rifle." Defendant testified that he saw five to six people, armed and "all pointing guns at me." [Doc. 81, 33:3-25]

   b. On the other hand, Agent Salcido testified that he did not have his gun drawn when he approached the residence to knock. He drew his weapon when he entered the home to search for Ms. Gutierrez. After detaining Ms.

Gutierrez he holstered his weapon and did not draw it again that day. [Doc. 75, 74:12 to 75:13, 79:20 to 80:1]

c. The Court finds this discrepancy immaterial given subsequent events as described herein, below.

17. Regarding whether Defendant gave officers permission to search for Shauna Gutierrez:

a. Agent Salcido told Defendant that they were police, they were looking "for Shauna," and asked whether she was in the house. [Doc. 75, 69:5-9]

b. Agent Salcido testified that Defendant answered Agent Salcido "no" when asked if Shauna Gutierrez was in the house. [Doc. 75, 70:11-15]

c. Agent Salcido then asked "Do you mind if we search?" and, according to Agent Salcido, Defendant answered "Go ahead." [Doc. 75, 70:13-17]

d. According to Agent Salcido, as Defendant gave consent to enter to search for Shauna, Defendant stepped down the steps to the doorway, making room for Agent Salcido to enter. [Doc. 75, 85:15-21]

e. On the other hand, Defendant testified that officers were yelling "Is Shauna Gutierrez in the house?" when Defendant answered the door. Defendant testified that he told them, "There's nobody here by that name." [Doc. 81, 36:10-15]

f. Defendant testified that officers next asked "Is there any girls in the house," to which he responded yes, and that an officer then went to get a wanted

poster to show him the woman. At that point in time, Defendant heard someone yell from inside his house, "I found her." [Doc. 81, 36:2 to 37:12]

g. Defendant denied that he consented to entry into his house to find Ms. Gutierrez or anyone. [Doc. 81, 39:24 to 40:1] Defendant testified that officers "shooed" him off the stairs and had him sit on a log outside of his home, with Mr. Miramontes. [Doc. 81, 39:4-12]

h. The Court finds the Agents' testimony concerning his consent to search for Ms. Gutierrez credible and Defendant's testimony not credible.

i. The Court finds that Defendant consented to Agents' entry into his residence to look for Ms. Gutierrez.

j. The Court finds that no agent entered Defendant's residence prior to obtaining Defendant's consent to search for Ms. Gutierrez.

18. When Defendant exited the front door, Agent Howard determined that "it was a friendly encounter" and thus lowered his rifle, and he did not raise it again that day. [Doc. 75, 38:20-23]

19. Agent Howard spoke to Defendant and either Agent Howard or another officer asked Defendant to "stay outside." [Doc. 75, 37:13-16]

20. Agent Howard walked with Defendant to "the bottom of the trailer," where there were railroad ties. Agent Howard and Defendant "started having small talk." [Doc. 75, 37:14 to 38:1]

21. Agent Howard testified that "There was no hostility from Mr. Warwick; there was none from us. This was not an encounter where I felt there needed to be a verbal

judo or that I thought we were going to have an altercation or anything. He was very pleasant. His demeanor was fine." [Doc. 75, 39:16-20]

22. Defendant testified that officers used their rifles to direct him where to go and told him to "sit there and stay there." [Doc. 81, 40:7 to 41:12] The Court finds this testimony not credible.

23. At one point, Defendant asked to go in his house and get a cigarette because he was upset but he was told he could not do so. [Doc. 81, 41:13-24]

24. While Agent Howard stayed with Defendant, Agent Sainato, Agent Salcido and Officer Myers entered the residence to search for Ms. Gutierrez and eventually searched the bedroom to the left of the front entrance, marked as B1 on GEX 48. [Doc. 75, 70:19 to 71:4 (Salcido)]

25. Agents opened the closet door in the bedroom and found Shauna Gutierrez hiding in the closet with her hands up. [Doc. 75, 71:6-20]

26. While retrieving Ms. Gutierrez from the closet, Agent Salcido observed two firearms in the closet. [Doc. 75, p. 71:16-25]

27. Agent Sarah Rich then entered the residence to do a "thorough pat-down of Ms. Gutierrez." [Doc. 75, 72:2-5 (Salcido)]

28. Law enforcement officers continued to search the residence "to make sure there was nobody else hiding." [Doc. 75, 72:20-24 (Salcido)]

29. Agent Salcido then stayed with Ms. Gutierrez inside the residence until Defendant signed a consent-to-search form. [Doc. 75, 73:16-21]

30. At some point prior to Defendant signing a consent-to-search form, Agent Acee entered the residence and spoke to Ms. Gutierrez. [Doc. 75, 89:16 to 90:3 (Salcido), 75, 103:9-25 (Acee)]

31. After Ms. Gutierrez was detained, and before Defendant signed a consent-to-search form, Agent Howard went into the trailer and observed the firearms in the closet. [Doc. 75, 41:18-21]

32. In the meantime, when Agent Acee arrived on the scene, he went to the right side of the property (as shown on GEX 48). He found a man working on a truck next to the residence. The man was later identified as John Miramontes. [Doc. 75, 98:15 to 99:5]

33. Agent Acee's encounter with Mr. Miramontes was friendly and he did not give Mr. Miramontes any commands or have his weapon drawn, though his SWAT rifle was hanging on a sling off his shoulder pointing at his feet and he had on a ballistic tactical vest. [Doc. 75, 99:14 to 100:8, 100:23 to 101:5]

34. Agent Acee showed Mr. Miramontes a photograph of Shauna Gutierrez, and Mr. Miramontes stated something like "That looks like Sally." [Doc. 75, 100:1-20]

35. Agent Acee asked whether Mr. Miramontes lived at the residence, and Mr. Miramontes stated he did. Mr. Miramontes also stated that Bill or William and Sally also lived at the residence. [Doc. 75, 101:8-17]

36. Agent Acee spoke to Mr. Miramontes for approximately a little over a minute before other law enforcement officers announced on the radio that they had Ms. Gutierrez in custody. [Doc. 75, 102:1-16]

37. Agent Acee then asked Mr. Miramontes to walk toward the front of the residence and left him with another agent while Agent Acee entered the residence. Agent Acee went into the residence to speak with Ms. Gutierrez and ask her to identify the other individuals at the residence because he suspected she would be with other gang members. [Doc. 75, 102:12-22, 104:1-8]

38. Agents did not handcuff Defendant or Mr. Miramontes during their time at 93 Cielo Azul on August 3, 2016, however, they escorted Defendant and Mr. Miramontes and did not let Defendant enter his home while they searched it. [Doc. 75, 43:7-16, 54:19-24 (Howard), 103:1-8, 105:4-22 (Acee)]

39. Agent Acee described his encounter with Mr. Miramontes as "friendly" and "almost a casual encounter, except that I'm dressed tactically." [Doc. 75, 99:14, 100:7-8] He also testified that Mr. Miramontes was not "aggressive or rude" and that he was "very cooperative, polite." [Doc. 75, 102:23-25]

40. After Agent Acee spoke with Ms. Gutierrez in the residence, he went out and introduced himself to Defendant. [Doc. 75, 105:1-11]

41. Defendant did not know Ms. Gutierrez's actual identity. [Doc. 75, 106:2-9]

42. Agent Acee told Defendant that the agents would be present "a little while" and mentioned that there were guns in the closet where they found Ms. Gutierrez. Agent Acee had not determined whether Defendant had prior felony convictions at the time of this discussion. [Doc. 75, 106:10 to 107:2]

43. Agent Acee testified that, in response to his statement, Defendant "told me kind of his feelings on the Second Amendment and the right to have guns, and we got in a

little bit of conversation about that, and I kind of eased out of that." [Doc. 75, 107:3-10]

44. Agent Acee testified that Defendant also "volunteered" that the guns were his, not Ms. Gutierrez's. [Doc. 75, 107:12-16]

45. Prior to obtaining Defendant's consent to search the residence, Agent Acee ran Defendant's criminal history. [Doc. 75, 110:15-19 (Acee)]

46. Thereafter, Agent Acee asked Defendant and Mr. Miramontes to sign a consent-to-search form. [Doc. 75, 108:19 to 110:5; GEX 2]

47. Regarding the length of the encounter prior to the consent-to-search form:

    a. Defendant testified that law enforcement had been on his property 35-40 minutes before asking him to sign a consent-to-search form, and during that time he saw five or six law enforcement officers going inside his residence, at different times. [Doc. 81, 44:1-16]

    b. Agent Howard testified that officers arrived at Defendant's property at 11:40, while Agent Acee testified they arrived at 11:50, in which case officers would have been present 25-35 minutes prior to Defendant signing the consent-to-search form. [Doc. 75, 47:16-20, 104:19-22]

    c. The Court finds that agents arrived at Defendant's property at approximately 11:40 a.m., and thus approximately 35 minutes passed before agents obtained Defendant's signature on the consent to search form.

48. Agent Acee explained the consent-to-search form to Defendant. He stated that no weapons were pointed at Defendant during this time. He also described his

conversations with Defendant as "almost" friendly.  [Doc. 75, 110:21 to 111:11]
He stated that no threats were made to Defendant or to Mr. Miramontes.  [Doc. 75, 114:22-24]

49. Agent Acee explained the consent-to-search form by identifying the form and reading each line to the person to whom he is explaining the form.  [Doc. 75, 113:24 to 114:9]  He also told Defendant "You can limit my search.  If there's areas you don't want us to search, just tell me.  And if you want us to stop searching at any time, just tell me."  [Doc. 75, 114:10-13]

50. Defendant was friendly and agreeable and responded to Agent Acee:  "Well, you guys are already here anyway," and signed the form.  [Doc. 75, 114:14-16]  The Court finds Defendant's contradictory testimony not credible.

51. Agent Acee obtained Mr. Miramontes consent and signature on the consent-to-search form because he lived in one of the bedrooms of the residence.  [Doc. 75, 114:17-21]

52. Although Defendant testified that he was told that if he signed the consent-to-search form he would not go to jail [Doc. 81, 45:1-21], the Court finds this testimony not credible.

53. Regarding his decision to sign the consent-to-search form, Defendant also testified that he signed the consent-to-search form because "[t]he peer pressure of all the armed men, demanding what they wanted to get, and doing what they wanted to do, without any control of myself having over the situation.  I didn't really have a

choice." [Doc. 81, 45:22 to 46:5] However, the Court finds this testimony not credible.

54. The consent-to-search form [GEX 2] states:

DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
**CONSENT TO SEARCH**

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of . . . 93 Cielo Azul, San Clemente, NM[.]
2. I have been advised of my right to refuse consent.
3. I give this permission voluntarily.
4. I authorize these agents to take any items which they determine may be related to their investigation.

55. The form is dated August 3, 2016, and the time is noted as "1215 HRS." Agents Acee and Sainato signed the forms as witnesses. [GEX 2]

56. Only one or two agents were standing around Mr. Miramontes and Mr. Warwick when they signed the consent-to-search form. [Doc. 75, 119:4-15]

57. After Defendant signed the consent-to-search form, several law enforcement officers again searched the residence, including at least Agents Howard, Salcido, Sainato and Neale. [Doc. 75, 42:8 to 43:6, 73:22 to 74:5]

58. The Court finds that, by the time Agents asked Defendant to sign the consent-to-search form, at least six officers (Agents Sainato, Salcido, Acee, Rich, Howard, and Task Force Officer Myers) had previously entered Defendant's trailer at various times. [Doc. 75, 70:17 to 71:4, 72:2-5, 73:7-21, 89:16 to 90:3] At least Agent Salcido stayed inside the residence until Defendant signed the consent-to-search form. [Doc. 75, 72:12 to 73:21]

59. After Defendant signed the consent-to-search form, Agents Salcido, Sainato and Neale found ammunition in a credenza. [Doc. 75, 73:22 to 74:5]. Agent Salcido also more closely observed the firearms in the closet. [Doc. 75, 74:1-7]

60. Agent Howard found some methamphetamine inside a black leather vest on the floor next to the front door. [Doc. 75, 115:8-12]

61. Agents also observed syringes and pipes throughout the trailer. [Doc. 75, 106:16 (Acee)]

62. On cross-examination, the Government asked Defendant:

> Q: And it's fair to say you've been a methamphetamine user for approximately 30 years?
> A: It was prescribed to me as medication, yes.

[Doc. 81, 62:14-16] Defendant explained that the difference between the methamphetamine found in his residence and the prescribed mediation was that "it's not in pill form." [Doc. 81, 62:22 to 63:18] Defendant testified that methamphetamine is "prescribed to me for having a disease called narcolepsy, which is a sleeping disorder, and it also is a painkiller." [Doc. 81, 64:7-15]

63. Defendant testified that "I had had my daily dosage" of methamphetamine on August 3, 2016, prior to the agents' arrival. His daily dosage "consists of point two-tenths of a gram in the morning, and two-tenths of a gram in the afternoon." [Doc. 81, 65:7-12]

64. Regarding the holster and the slingshot:

    a. According to Agent Howard, while he was outside with Defendant, he observed that Defendant was wearing a holster for a gun but there was no

gun in the holster. Defendant explained he carried a slingshot in the holster, which made some of the agents laugh. [Doc. 75, 39:20 to 40:5, 111:17 to 112:1, 173:5-15]

b. According to Agents Howard and Acee, they escorted Defendant to his truck and allowed Defendant to retrieve his slingshot. [Doc. 75, 40:22 to 41:4, 65:6-7 (Howard), 111:16 to 112:1 (Acee)]

c. According to Defendant, Agents did not allow him to approach his truck, and instead, an Agent "went in the back seat of the pickup, grabbed the slingshot . . . and brought it back over to me and handed it to me." [Doc. 81, 43:1-22]

d. Defendant attempted to demonstrate to Agents Acee and Howard that a slingshot fit into the holster, but the agents testified that slingshot did not fit well and fell out of the holster. This led Agent Howard to reasonably conclude that Defendant probably had a firearm. [Doc. 75, 40:22 to 41:14 (Howard), 110:17 to 112:6 (Acee)]

e. Defendant testified that the slingshot did fit in the holster, and "I pulled it out of the holster, did a quick-action draw, and they all jumped about a foot, and we all laughed." [Doc. 81, 77:7-15]

f. The Court finds this discrepancy in the testimony immaterial for the reasons set forth herein, below.

65. Agent Acee believed the slingshot discussion occurred after the consent-to-search form was signed. [Doc. 75, 112:5-12]

14

66. At 12:58, Agent Acee had Defendant sign an advice-of-rights form. [GEX 4; Doc. 75, 115:24 to 117:1]

67. During the time between Defendant's signing of the consent-to-search form and his signing of the advice-of-rights form, Agent Acee advised Ms. Gutierrez of her rights and interviewed her. [Doc. 75, 117:22 to 118:11]

68. The Court finds that, despite the sizeable number of officers present and their prominent display of guns, including rifles, Defendant remained calm, confident, pleasant, and assertive from the time that he exited his home until the officers left.

69. The Court finds that Defendant voluntarily consented to the search of his residence, both for Ms. Gutierrez and later to a full search, and he was not coerced into consenting to the search. Defendant never limited his consent to the search.

70. The Court finds that Defendant understood the advisements within the consent-to-search form, including the right to refuse consent to either search.

71. The Court finds that the advisements in the consent-to-search form were sufficiently clear and unambiguous to outweigh any arguably coercive effect of the atmosphere of the encounter.

72. The Court finds that Defendant never revoked his consent to search his residence.

### *November 7, 2016 – 93 Cielo Azul*

73. After August 3, 2016, Agent Sainato wrote a criminal complaint and obtained a warrant for Defendant's arrest based on the firearms that were found on August 3, 2016. [Doc. 75, 118:18 to 119:3; Doc. 1; Doc. 2]

74. On November 7, 2016, five agents, including Agent Acee, went to Mr. Warwick's property at 93 Cielo Azul, in two vehicles, to execute the arrest warrant. [Doc. 75, 119:14-21]  The other officers were Agent Sainato, Agent Stemo, Task Force Officer Myers, and Task Force Officer Cupit. [Doc. 75, 134:2-4]

75. Agent Acee pulled up to the right side of the property as shown on GEX 48. He observed Defendant outside where the letters JM are on GEX 48. Defendant was working on a motorcycle. Another man was with Defendant at the time. [Doc. 75, 119:14 to 120:2]

76. Agents drew their weapons when they exited their vehicles and addressed Defendant, and continued to have their weapons drawn until Defendant and his companion were handcuffed. [Doc. 75, 161:24 to 163:11; Doc. 81, 51:8-17]

77. Defendant testified that he and his companion, Mickey Le, were approximately 30 feet from the door of the trailer working on the motorcycle. [Doc. 81, 50:6-17]

78. Agent Acee called to Defendant, saying "Hey, Bill, come here." Defendant did so. [Doc. 75, 120:3-4]

79. Defendant and Mr. Le had tools in their hands, and thus Agent Acee told them to show their hands and walk back toward the agents, one at a time. Agents handcuffed both men. [Doc. 75, 120:17-25]

80. Agent Acee had not seen Mr. Le before and did not know who he was. [Doc. 75, 119:19 to 120:2]  Agent Acee observed that Mr. Le had tattoos which he suspected were affiliated with a White prison gang or "a White power," and thus Agent Acee

asked him who his "P.O." was, meaning who was his probation or parole officer. Mr. Le said he was discharged. [Doc. 75, 122:3-17]

81. Agent Acee also observed that there were two additional recreational vehicles (RVs) on the property that were not present on August 3, 2016. He recognized one as Shauna Gutierrez's RV. The presence of the new RVs concerned Agent Acee because he thought "[t]here would be more people." [Doc. 75, 121:10-25]

82. The back door to Defendant's trailer was entirely open. That also concerned Agent Acee and drew his attention. [Doc. 75, 122:18 to 123:6] Agent Acee testified that an open door is a more immediate threat to officer safety because someone could be standing inside and fire through the door and agents would not be able to see the person. He testified that in 2007, he was shot at and his fellow officer was shot "in a similar situation." [Doc. 75, 124:11-20]

83. Agent Acee also testified that he was concerned because on, August 3, 2016, Defendant had insisted that the Second Amendment trumped any laws, state or federal, so that no matter what, he had the right to have firearms. [Doc. 75, 123:7-18]

84. Also on August 3, 2016, Defendant had told Agent Acee that methamphetamine had medicinal qualities and should be legal, and that he regularly used methamphetamine. [Doc. 75, 123:19-23]

85. Agent Acee testified that methamphetamine and firearms are dangerous,

> [a]nd when you put the two together, it's never a good situation. So my concern is, we have meth users and we have gun nuts and we

have outbuildings and cars everywhere, and this is a tweaker pad for transients, and I'm worried that we need to get control of this scene.

[Doc. 75, 124:4-10]

86. Based on these concerns, Agent Acee testified that, without seeking Defendant's consent [Doc. 75, 137:6-18], he decided to conduct a protective sweep inside Defendant's trailer. [Doc. 75, 124:24 to 125:9]

87. Before the grand jury, Agent Sainato testified that "other agents did a protective sweep of the trailer, which is customary in an arrest scenario." [GEX 49]

88. Defendant first testified that Agent Acee requested his consent to go in the residence, and Defendant said "There's no reason to go into the house if you have an arrest warrant for me. Here I am. Arrest me." Defendant testified that Agent Acee did not verbally respond and just turned and went into the house. [Doc. 81, 52:23 to 53:9]

89. However, on cross-examination Defendant testified that Agents did not ask his consent to enter his residence on November 7, 2016:

> Q: And at that time, it's your testimony that you did not give consent to search the house?
> A: I was not asked.
> Q. So it's your testimony that you weren't asked at all whether or not agents could search your house?
> A: I was told to come forward, get on my knees, and I was put in handcuffs.

[Doc. 81, 78:16-25]

90. Mr. Miramontes' trailer was also on the property. Defendant testified that Agents did not enter Mr. Miramontes' trailer. [Doc. 81, 53:17-23]

91. While conducting the protective sweep in Defendant's bedroom, Agent Acee panned his flashlight "over the stuff on the dresser," and "saw the silver backstrap of a very large pistol." [Doc. 75, 126:6-19] Agent Acee stated that the gun was in plain view inside an open drawer. [Doc. 75, 126:18-19, 128:1-19, 130:4 to 132:12] The Court finds Agent Acee's testimony credible and the Court finds Defendant's contradictory testimony that the drawer was "always closed" and was closed on November 7, 2016 [Doc. 81, 56:11 to 57:17] not credible.

92. Agent Acee testified that GEX 15 depicts the firearm in the open drawer as he saw it without any manipulation, other than light shone on the area. Government Exhibit's 16 and 17 show the same open drawer from progressively closer angles. [Doc. 75, 128:3 to 130:7; GEX 15, 16, 17]

93. Though the items in the drawer are not particularly easy to decipher on GEXs 15, 16, and 17, GEX 17 shows, in the left-hand side of the drawer, what appears to be metal running down wood, in a shape consistent with the grip of a pistol.

94. In order to take the pistol out of the drawer, he needed to remove an object from inside the drawer that was preventing the drawer from opening. When he removed that object, he saw it was a jar with marijuana in it, as depicted in DEX C. [Doc. 75, 169:9 to 170:4]

95. When Agent Acee took the first pistol out of the drawer, he saw some marijuana buds, as shown on GEX 18. [Doc. 75, 131:4-23]

96. When Agent Acee took the first pistol out of the drawer, he saw a second pistol underneath it. [Doc. 75, 132:4-7]

97. Agents found a box of ammunition on a shelf in Defendant's room, without manipulating anything to discover the ammunition, as shown in GEX 20. [Doc. 75, 138:9 to 139:5] The Court finds this testimony by Agent Acee credible and finds Defendant's contradictory testimony that the cabinet was always closed and was closed on November 7 [Doc. 81, 56:11 to 57:17] not credible.

98. Agents photographed and seized a stack of empty plastic baggies, seen in plain view, as shown on GEX 22, which Agent Acee testified he believed were used to package methamphetamine. [Doc. 75, 139:6-14]

99. The Court finds that the drawer where the guns and marijuana were found and the cabinet where the ammunition was found were in the open position on November 7, 2017, and that agents saw the first gun and the ammunition in plain view without manipulating the drawer or its contents or the cabinet or its contents.

## CONCLUSIONS OF LAW

### *August 3, 2017 Search – 93 Cielo Azul*

#### *Consent to Search for Ms. Gutierrez*

"A well-settled tenet of Fourth Amendment jurisprudence is that searches conducted without a warrant and probable cause are per se unreasonable, subject only to a few recognized exceptions." *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985).

> Voluntary consent to search is one such exception. But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting consent would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

> The government bears the burden of proving that consent is given freely
> and voluntarily. . . . The question whether a consent to a search was in fact
> voluntary or was the product of duress or coercion, express or implied, is a
> question of fact to be determined from the totality of all the circumstances.

*United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) (internal brackets,

quotation marks and citations omitted). "The central question is whether a reasonable

person would believe he was free to . . . disregard the officer's request." *United States v.*

*Silva-Arzeta*, 602 F.3d 1208, 1214 (10th Cir. 2010). "The government must (1) proffer

clear and positive testimony that consent was unequivocal and specific and freely and

intelligently given, and (2) the officers must have used no implied or express duress or

coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010) (internal

quotation marks and citation omitted). "A signed consent form is indicative of a

voluntary consent." *Eidson v. Owens*, 515 F.3d 1139, 1147 (10th Cir. 2008).

The Court must consider all of the circumstances surrounding the consent,

including but not limited to:

> physical mistreatment, use of violence, threats, promises, inducements,
> deception, trickery, or an aggressive tone, the physical and mental
> condition and capacity of the defendant, the number of officers on the
> scene, and the display of police weapons. Whether an officer reads a
> defendant his Miranda rights, obtains consent pursuant to a claim of lawful
> authority, or informs a defendant of his or her right to refuse consent also
> are factors to consider in determining whether consent given was voluntary
> under the totality of the circumstances.

*Harrison*, 639 F.3d at 1278 (internal quotation marks and citation omitted). In addition,

"an officer's threat to obtain a warrant may invalidate the suspect's eventual consent if

the officers lack the probable cause necessary for a search warrant." *Eidson*, 515 F.3d at

1146. In sum, the Court must "determine[] the factual circumstances surrounding the

[consent], assess[] the psychological impact on the accused, and evaluate[] the legal significance of how the accused reacted." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

As an initial matter, the Court concludes that Defendant consented to the agents' entry into his trailer on August 3, 2016 to search for Ms. Gutierrez. Defendant does not argue that this consent was coerced because Defendant, instead, argues that it did not happen. However, the Court credits the testimony of Agents Sainato and Salcido that Defendant consented to their search for Ms. Gutierrez and that they entered the residence and found Ms. Gutierrez. The Court also credits the testimony of Agent Acee that he was outside with Mr. Miramontes when other officers stated on the radio that they found Ms. Gutierrez, and, therefore, the Court finds that Agent Acee did not enter the residence through the back entrance without Defendant's consent. The Court therefore does not credit Defendant's testimony that an agent entered without his consent through his back entrance and found Ms. Gutierrez. Thus, the Court concludes that Defendant granted Agents permission to enter his trailer to search for Ms. Gutierrez. Thus, the remaining issue is whether Defendant's subsequent consent to the search of his home, as evidence by his signature on the consent-to-search form at 12:15, was coerced. In order to decide this issue, the Court considers Defendant's arguments under the case law as well as pertinent Tenth Circuit cases considering whether there was coercion.

Defendant primarily relies on *Bumper v. North Carolina*, 391 U.S. 543, 546 (1968) to argue that agents gave him the impression that they had the authority to search his home and that he had no right to resist the search. [Doc. 90, p. 6] In *Bumper*, the

defendant's 66-year-old grandmother, Mrs. Leath, who lived "in a house located in a rural area at the end of an isolated mile-long dirt road," was home with "some young children" when four law enforcement officers came to her home. *Id.* Mrs. Leath was African American and the law enforcement officers were White. *Id.* An officer announced, "I have a search warrant to search your house," so Mrs. Leath allowed the officers to enter and conduct the search. *Id.* (internal quotation marks omitted). However, in court, the State relied not on a search warrant, but on Mrs. Leath's consent to justify the search. Mrs. Leath testified: "He said he was the law and had a search warrant to search the house, why I thought he could go ahead. I believed he had a search warrant. I took him at his word." *Id.* at 547 (internal quotation marks and citation omitted). The Court held that the government cannot meet its burden of demonstrating that consent is "freely and voluntarily given" where the government shows "no more than acquiescence to a claim of lawful authority." *Id.* at 548-49. The Court stated:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id.* at 550.

The Court concludes that *Bumper* is not analogous to the facts at hand. In this case, officers did not expressly or falsely assert that they had the authority to enter Defendant's home pursuant to a warrant. In *Bumper*, law enforcement officers expressly misled Mrs. Leath into believing they had a warrant, while such deception is absent in this case. *See United States v. Thompson*, 524 F.3d 1126, 1134 n.4 (10th Cir. 2008)

(rejecting argument relying on *Bumper* where the officers did not make an assertion of lawful authority for the search). Further, the Court does not believe a reasonable person would interpret the officer's actions of entering to find Ms. Gutierrez and then entering several other times before asking for his consent to search as an implicit assertion that they had authority, other than Defendant's initial consent, to do so.

On the other hand, the facts in *United States v. Cruz-Mendez*, 467 F.3d 1260 (10th Cir. 2006) are much more similar to this case. In *Cruz-Mendez*, the Court was not persuaded by the argument that a woman, Ms. Armenta, was coerced into consenting to a search of her bedroom. *Id.* at 1267. Four officers conducted a "knock and talk," looking for a man reportedly seen at Ms. Armenta's address. *Id.* at 1262. The officers told Ms. Armenta it was cold outside and asked to come in, to which Ms. Armenta agreed. *Id.* at 1262-63. The officers asked to check out the bathroom for their safety and Ms. Armenta again agreed. *Id.* at 1263. The officers then asked for consent to search the full apartment, which she refused. *Id.* They asked for consent a couple more times, and stated they would go get a warrant, which she told them to do. *Id.* On their way out, they noticed the man's cell phone, with his name etched into it, sticking out of a man's jacket. *Id.* The woman then admitted that the man was in her bedroom and they could search it. *Id.* at 1264.

The Tenth Circuit upheld the district court's conclusions that neither the initial consent to the entry of the apartment nor the second consent to the search of the bedroom were coerced. *Id.* at 1265-67. The Court stated that the defendant's argument that "the presence of several armed officers, the length of time the officers were in the apartment,

24

and the officers' statement that they would get a search warrant if Ms. Armenta did not consent" may "have persuaded a rational fact-finder that the consent was involuntary." *Id.* at 1267. Nonetheless, the Court refused to "set[] aside the district court's finding," concluding that the finding of consent was not clearly erroneous. *Id.* The Court relied on factors including that "the officers were not overly threatening or forceful," the length of time was reasonable, that the officers' threat to obtain a warrant did not result in Ms. Armenta's consent to search, and that Ms. Armenta instead consented when was caught in a lie. *Id.* at 1267-68; *see also United States v. Melendrez-Moreno*, 126 F. App'x 919, 923 (10th Cir. 2005) (unpublished opinion) ("[I]t is irrelevant whether consent was given before the officers crossed the threshold because it is uncontradicted that Defendant gave oral consent to search before the officers began inspection of his house.").

Applying *Cruz-Mendez* and *Melendrez-Moreno* to the case at hand, Defendant must point to some facts beyond the agents' presence in his home to establish coercion. Here, arguably such circumstances include that Defendant was outside, under escort, and not allowed to enter his home. In addition, several officers, including Agents Acee and Howard, had rifles and early in the encounter those rifles were raised and aimed, either at the house or at Defendant. Even when the rifles were not raised, they were prominently hanging in front of the Agents' bodies.

Nonetheless, in the view of the Court, the more significant facts are those relating to the level of intimidation or coercion displayed by the officers and the demonstrated "psychological impact" of the officers' conduct on Defendant. *Schneckloth*, 412 U.S. at 226. Everyone testified that, while Defendant was waiting outside of his home, the

encounter between Agents and Defendant was cooperative, polite and even nearly friendly.  Further, Defendant did not act meek, upset, frightened, confused or intimidated.  Instead, he was adequately confident to stand his ground or assert his perceived rights pursuant to the Second Amendment.  Even after he signed the consent-to-search form he joked with the officers regarding his slingshot, which does not seem consistent with a person whose will was recently overborne.  Furthermore, the Court does not credit Defendant's claim that any officer threatened Defendant or made him a promise, such as not to be arrested, in exchange for his consent to search the property.

Turning to the moments directly leading up to Defendant's consent, Defendant testified that, when he was asked to sign the consent-to-search form, he told Agent Acee, "You've already searched anyway.  What does it matter?"  [Doc. 81, 45:7-13]  However, Agent Acee testified that Defendant told him, "Well, you guys are already here anyway" and signed the form.  [Doc. 75, 114:14-16]  Though these statements are similar, they have significantly different implications when considering whether Defendant was coerced.  Defendant's belief that officers were already searching his home is reasonable given the circumstances that six agents had entered his home over approximately a 35-minute period, he was kept out of his home, and officers were still in his home with Ms. Gutierrez at the time Agents obtained Defendant's signature on the consent-to-search form.

However, even if the Court were to credit Defendant's testimony as to his statement to Agent Acee, given the advisements on the consent-to-search form, Defendant's act of signing the form is a strong indication that Defendant's consent was

26

voluntary. The consent form expressly states "I have been advised of my right to refuse consent" and "I give this permission voluntarily." [GEX 2] The Court weighs Defendant's evidence of coercion, including his testimony that guns were pointed at him, that he was not allowed to enter his home for a cigarette, and that he was under escort and observation, against the strength and clarity of the advisements in the consent-to-search form. *Eidson*, 515 F.3d 1147 (weighing the fact that individuals signed a consent to search form against their evidence of coercion and stating that "[a] signed consent form is indicative of a voluntary consent"). This case is similar to *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1567-68 (10th Cir. 1993), in which our Tenth Circuit rejected the argument that a defendant was coerced to sign consent-to-search forms. In *Rodriguez-Garcia*, before the defendant signed the forms, he had been handcuffed and detained in the back of a DEA vehicle. *Id.* at 1566. Armed agents were present at his apartment, and he may have been pushed into the snow while being arrested. *Id.* at 1567. Nonetheless, noting that there was no evidence that he was abused, frightened, otherwise threatened or forced into signing the consent forms, the Court concluded that the agents did not coerce the defendant to consent to the search. *Id.* at 1567-68. Here, any potential evidence of coercion or a coercive atmosphere is not as strong as that in *Rodriguez-Garcia*. And, unlike the facts in *Rodriguez-Garcia*, officers here did not handcuff Defendant or use physical force.

Finally, considering at additional factors, such as those in *Harrison*, though this is a close call, the Court concludes that the Government has demonstrated that Defendant was not coerced into consenting to the search of his residence. No one was physically

mistreated, there was no use of violence against Defendant, no "threats, promises, inducements, deception, [or] trickery," and little if any use of an aggressive tone. *Harrison*, 639 F.3d at 1278. Defendant was in good physical and mental condition and understood what was happening on August 3, 2016. Though there were several officers on the scene who were displaying their weapons, Defendant did not exhibit fear or intimidation. Instead, the encounter was relaxed, nearly friendly, and at times jovial. Moreover, Defendant demonstrated confidence and a lack of fear in asserting his beliefs with regard to the Second Amendment. At all times Defendant displayed a calm yet assertive nature, suggesting that his will was not overborne. In sum, the Court concludes that Defendant was not coerced into signing the consent-to-search form. Given these facts, the Court also concludes that the advisements on the consent-to-search form were sufficient to overcome any perceived coercive atmosphere or effect of the circumstances during the encounter.

### *Inevitable Discovery Doctrine*

The Government argues that "[b]ased on the discovery of prohibited firearms in Defendant's closet pursuant to Gutierrez's arrest, . . . agents would have sought and received a search warrant to search for evidence of crime seen in plain view during the search for Gutierrez." [Doc. 41, p. 9] Because the issue of consent is a close call, the Court considers the Government's argument, and is persuaded by it. The Court concludes that, in the alternative to the warrantless search falling into the exception for consensual searches, officers had sufficient probable cause to obtain a search warrant and

would have done so in this case making the search lawful under the inevitable discovery doctrine.

"The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000). "Where the theory of inevitable discovery is that a warrant would have been obtained but for the illegal search, the district court must determine how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (internal quotation marks and citation omitted). In *Souza*, our Tenth Circuit expanded the inevitable discovery doctrine from applying only when "an independent investigation inevitably would have led to discovery of the evidence" to also include the circumstance in which a warrant would have eventually been issued based on evidence already lawfully discovered. *Souza*, 223 F.3d at 1203. The Court stated: "[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search." *Id.* at 1204 (internal quotation marks and citation omitted). The Court set forth four factors to consider in deciding whether evidence would have been inevitably discovered:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," [*United States v. Cabassa*, 62 F.3d 470, 473 (2nd Cir. 1995)]; 2) the strength of the showing of probable cause at the time the search occurred, *see id.* at 473–74; 3) whether a warrant ultimately was obtained, albeit after the illegal entry, *see id.* at 473; and 4) "evidence that law enforcement agents 'jumped the gun'

> because they lacked confidence in their showing of probable cause and
> wanted to force the issue by creating a fait accompli," *id.* at 473 n. 2.

*Id.* Subsequently, our Tenth Circuit clarified that the likelihood that the warrant would have been issued is the "ultimate question" and that there is no prerequisite that officers take preliminary steps to obtain a warrant before the search. *Christy*, 739 F.3d at 542-43.

Applying this law to the case at hand, given the lawfulness of the initial entry to search for Ms. Gutierrez, officers had already discovered the rifles and would have found the ammunition and methamphetamine through a search supported by a warrant. Here, while retrieving Ms. Gutierrez, Agents observed two firearms, and, during the course of the encounter, queried whether Defendant had prior felony convictions. In addition, Defendant was wearing an empty holster when he answered the door. These facts established the probable cause necessary for officers to obtain a warrant to search Defendant's home on suspicion that Defendant was a felon in possession of firearms. While Agents had not begun the process to obtain a search warrant, nor was one ever sought or issued, applying *Christy*, 739 F.3d at 542-43, the primary inquiry is the likelihood that a warrant would be issued, which is dependent on the strength of the showing of probable cause. In this case, the strength of the showing of probably cause is "overwhelming," *Souza*, 223 F.3d at 1205, and not reasonably disputable. Officers would have been able to obtain a search warrant. As such, the inevitable discovery doctrine exception to the exclusionary rule applies, making the evidence discovered in Defendant's home on August 3, 2016 admissible.

Accordingly, the Court **DENIES** *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 43]

### *November 7, 2016 Search – 93 Cielo Azul*

Defendant also moves to suppress evidence found during a search of his residence on November 7, 2017.[2] [Doc. 33] The United States relies solely on the protective sweep exception to the warrant requirement to justify the November 7, 2016 search of Defendant's property. [Doc. 39, p. 4] Prior to November 7, 2016, The United States obtained an arrest warrant for Mr. Warrick (but not a search warrant) based on the evidence observed at Mr. Warrick's residence on August 3, 2016. [Doc. 39-1, p. 2] On November 7, 2016, agents executed the arrest warrant and found Defendant and Mr. Le on the back side of Defendant's property. Agents placed both men in handcuffs and detained them outside of the residence. No one consented to a search of the residence. [Doc. 75, 120:19-25] Agent Acee nonetheless entered to home to conduct a "protective sweep." [Doc. 75, 125:1-9]

In *Buie*, 494 U.S. at 334-36, our United States Supreme Court sanctioned and defined protective sweeps by holding as follows:

> We . . . hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. . . .

---

[2] The record suggests that additional evidence was found on Defendant's person incident to his arrest, however, that evidence is not the subject of a motion to dismiss.

> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* (footnotes omitted). The Government correctly argues that there are two different tests articulated in *Buie*: 1) for the areas immediately adjoining the place of the arrest, no reasonable suspicion is required to conduct a protective sweep; and 2) beyond the immediately adjoining areas, a protective sweep is justified only where officers have a reasonable suspicion that someone or something within the broader area poses a danger to those on the arrest scene. *Id.* at 334; *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004). [Doc. 39, p. 7] Only the second type of sweep, which must be supported by reasonable suspicion that "the area to be swept harbors an individual posing a danger," is at issue in this case. *Buie*, 494 U.S. at 334.

Protective sweeps "are only permitted incident to an arrest." *United States v. Torres-Castro*, 470 F.3d 992, 996 (10th Cir. 2006). Where an arrest occurs outside of private residential building (including a home, garage, barn, and hotel room), there must be some articulable facts to support a belief that someone posing a danger is in the residence. *See Fishbein v. City of Glenwood Springs, Colo.*, 469 F.3d 957, 962-63 (10th Cir. 2006) (stating that a protective sweep is permissible where "police relied on various bits of circumstantial evidence to inform their judgment that a hostile third party might be present" but not permissible where "officers had *no* reason to believe there was any hostile person—or any person at all—inside the house" (emphasis in original)); *see also*

*United State v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) (rejecting the argument that a belief that a murder suspect had an accomplice was sufficient to justify a protective sweep where there "was no indication that the officers were in danger from a hidden accomplice" at time of search and also concluding that a suspicion that "a child may have been inside in no way relates to officer safety, the goal of a protective sweep"); *United States v. Owens*, 782 F.2d 146, 151 (10th Cir. 1986) (concluding that there was no threat to officers' safety where they had "retreated to a safe position" away from a motel room after arresting the defendant).

In *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004), our Tenth Circuit held that the protective sweep exception to the requirement for a search warrant was not met where police arrested the suspect outside, and where there was no reason to believe that anyone else remained inside the garage or the backyard which were searched. The Court reasoned:

> The protective-sweep doctrine arose in the context of an arrest in a home. *See, e.g.,* [*Buie*, 494 U.S. at 327.] Officers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home. The risk is substantially diminished when the officers effect the arrest outside the home.

*Carter*, 360 F.3d at 1242. In addition, given that the two persons in the garage came out when they saw officers in their driveway, the Court stated that "the officers had no reason to believe a third person had stayed behind" or posed a threat. *Id.* Moreover, the Court stated: "Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme

Court in *Buie*." *Id.* at 1242-43. The Court reached similar results in *Hogan*, 38 F.3d at 1150 (concluding that, where defendant was arrested outside his home and officers conducted protective sweep after the arrest, the officers' belief that the defendant had an accomplice when he purportedly committed a murder over a month earlier was insufficient reason to conclude that "officers were in danger from a hidden accomplice on" the day of the search) and *United States v. Roof*, 103 F. App'x 652, 657-58 (10th Cir. 2004) (unpublished decision) (holding that a protective sweep was not supported where officers repeatedly relied on the justification that they did not know whether anyone else was present in a home or a garage; stating "[a] mere *absence* of information about whether anyone remains in a home does not justify a protective sweep" (emphasis in original)).

On the other hand, protective sweeps have been upheld where officers have some reason to believe a person is in that home and they are aware that firearms or a dangerous person may be present. *United States v. Cavely*, 318 F.3d 987, 996 (10th Cir. 2003) (holding that reasonable suspicion for a protective sweep existed where officers were told there was someone inside a residence, they suspected the residence was used to manufacture methamphetamine, and they knew that firearms had been found in the residence during a prior search); *United States v. Denson*, 775 F.3d 1214, 1219 (10th Cir. 2014) (holding that reasonable suspicion for a protective sweep existed where officers knew that their arrestee was a gang member with violent associates and that another person lived in the home who was wanted on an outstanding warrant); *Fishbein*, 469 F.3d at 962-63 (holding that reasonable suspicion existed for a protective sweep where officers

were told a teenage boy was in a residence and they knew that firearms were in the residence); *see United States v. Nelson*, No. 16-3292, 2017 WL 3526570, *3 (10th Cir. August 17, 2017) (stating that, had officers been told that someone was present in the house before they conducted a protective sweep such information would be "precisely the sort of specific, articulable information that might have permitted" the protective sweep); *see also United States v. Tabor*, 722 F.2d 596, 598-99 (10th Cir. 1983) (holding that reasonable suspicion existed for a protective sweep where agents heard a noise coming from a barn and had knowledge that the day of the search the arrestee had falsely denied the presence of weapons in his home).

Finally, our Tenth Circuit, in addition to this Court, have clearly and explicitly held that protective searches are not allowed as a "blanket safety rule" or standard procedure anytime officers make an arrest. *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) ("The Fourth Amendment does not sanction automatic searches of an arrestee's home, nor does the fact-intensive question of reasonable suspicion accommodate a policy of automatic protective sweeps."); *Nelson*, 2017 WL 3526570, *5 n.5 (stating that, "if . . . the United States Marshals Service for the District of Kansas maintains a practice that systemically ignores the framework set forth in *Buie*, such a practice would be troubling"); *see also United States v. Benavidez*, 16-CR-1732 MCA, Doc. 40 *12-13 (D.N.M. December 19, 2016) (holding, where Government argued that the "officer's protective sweep of the defendant's apartment was part of their standard police practice on domestic violence calls based on protection of others," that such a policy clearly violates the Fourth Amendment).

In arguing that Agents had reasonable suspicion that there was someone in the residence that posed a danger to the officers, the Government relies on the following facts:

(1) There were only five agents present on a large property in which they encountered three male individuals;

(2) Agents encountered an unknown third male (Le) with Defendant, whom agents had not encountered previously;

(3) Le's tattoos were believed to be affiliated with a prison gang, indicating that he was a danger and also a previously-convicted inmate;

(4) When FBI agents arrived at Defendant's residence, Agent Acee saw only Defendant and the unknown male later identified as Le; Miramontes, whom the FBI encountered living at the residence previously, was unaccounted for;

(5) Agents encountered 2 RVs which previously were not present on the property on August 3, 2016, when agents arrested Gutierrez;

(6) Agent Acee knew that one of these 2 new RVs belonged to Gutierrez, who agents knew had been incarcerated since her arrest in August, and so Agent Acee knew that "she didn't take [the trailer] there";

(7) Agent Acee noticed that there was more clutter in the yard than had been there in August;

(8) Defendant previously told Agent Acee, that "the Second Amendment trumped any laws, state or federal; that that was the most superior rule that should be followed," which led Agent Acee to the belief on November 7, 2016 that Defendant would possess firearms, as Defendant "believed no matter what, he had the right to have firearms;"

(9) Agent Acee noted on August 3, 2016 that Defendant's property appeared to be a methamphetamine "flop house, with syringes and pipes everywhere," . . . and knowing Defendant's position with respect to possessing firearms, Agent Acee was concerned that "we have meth users and we have gun nuts and we have outbuildings and cars everywhere, . . . and I'm worried that we need to get control of this scene;"

(10) Agent Acee was concerned that an unknown individual harbored at the residence may possess the handgun that would have fit in Defendant's gun holster that he was wearing on August 3, 2016, which pistol was still unaccounted for;

(11) FBI agents, including Agent Acee, observed that the trailer had an open door, which "is a more immediate threat," because "[a] person can fire through an open door and not stand at the door. They could be deeper into the structure and we may not be able to see them." . . . Indeed, Agent Acee had "been in a similar situation in 2007 where [agents] were doing the same

kind of operation, and someone shot at us, and a fellow police officer was shot," so that previous situation and the open door provided Agent Acee "a heightened sort of awareness for that sort of thing;"

(12) Agent Acee knew that Defendant's residence previously had harbored a felon, which Defendant denied when agents first asked him whether Gutierrez was in the home;

(13) Agent Acee was concerned about the remoteness of the area in which Defendant's residence was located, because "I'm not sure what law enforcement agency patrols that [area], but any kind of emergency response would have been prolonged;" and

(14) Agent Acee noticed that Defendant's demeanor had changed; on August 3, 2016, Defendant was "polite, nice[,] . . . . it was a friendly encounter," but when agents returned on November 7, 2016, Defendant "was not happy to see [Agent Acee]," and "seemed more upset."

[Doc. 89, pp. 12-15 (Record citations and footnotes omitted.)]

The Court concludes that most of these facts are not specific, articulable facts indicating that there was someone potentially dangerous to the agents inside Defendant's trailer, as required by *Buie* and its progeny. Facts which simply have no bearing on the relevant question of whether someone was inside the property and that someone posed a threat to the officers include: (1) the number of officers compared to the number of citizens and the size of the property; (2) the presence of Mr. Le outside; (3) that Mr. Le had tattoos which indicated he may have been in a prison gang; (5) the presence of two new RVs, which, alone, supports more of a hunch than a reasonable inference that additional people would be on the property and particularly inside Defendant's trailer; (6) the presence of Ms. Gutierrez' RV, even though she could not have been the person who took it there; (7) the presence of more clutter in the yard; (11) the open door, even given that Agent Acee had been shot at from an open door before; (12) that Ms. Gutierrez, a fugitive, had been inside the home on August 3, 2016; (13) the remoteness of

Defendant's property; and (14) that Defendant was upset to see agents on November 7th. Regardless of how upset Defendant was, and regardless of how threatening Mr. Le appeared, both men were handcuffed and guarded by armed agents at the time Agent Acee searched Defendant's trailer. The other factors listed above do not support an inference that someone would be present inside Defendant's home or that person would present a threat to officers. *See Nelson*, 2017 WL 3526570, *3 (stating that when officers have "no knowledge regarding the potential presence of a third person, then the government is per se unable to make the affirmative showing that *Buie* requires").

However, four facts and their combined implications are relevant to the *Buie* test. First, the Government relies on the fact that they believed that Mr. Miramontes lived at the residence and that he was "unaccounted for" at the time Agent Acee performed the protective sweep. [Doc. 89, ¶ 45(4)] A reasonable officer could assume that Mr. Miramontes was inside Defendant's trailer, given that he lived in a room therein three months earlier. Second, agents had reason to believe that Defendant would illegally possess firearms given his stance on the Second Amendment – which the Court concludes was a reasonable inference. [Doc. 89, ¶ 45(8)] Third, "Agent Acee was concerned that an unknown individual harbored at the residence may possess the handgun that would have fit in Defendant's gun holster" because officers did not find a handgun on their prior search. [Doc. 89, ¶ 45(10)] And fourth and finally, as Agent Acee summed up the entire situation, "Defendant's property appeared to be a methamphetamine 'flop house, with syringes and pipes everywhere,' . . . 'we have meth users and we have gun

nuts and we have outbuildings and cars everywhere, . . . and I'm worried that we need to get control of this scene.'" [Doc. 89, ¶ 45(9)]

The Court is not persuaded that these facts establish a reasonable suspicion that someone in the home presented a danger to the officers. Particularly, the *Buie* requirement lacking in this case is any specific articulable fact warranting a rational belief that Mr. Miramontes was dangerous to the officers. It is noteworthy that, unlike in many protective sweep scenarios, here officers had a prior encounter with Defendant and Mr. Miramontes. During this prior encounter, Agent Acee testified, without contradiction, that Mr. Miramontes was friendly, polite, cooperative, and did not present a threat to the officers. [Doc. 75, 99:12 to 100:8, 102:23-25] This is true despite the fact that there were weapons in the residence during the first encounter and despite the fact that the home, at that time, appeared to be a "meth flop house." [Doc. 75, 102:23-25] Thus, even if a reasonable inference could be made that Mr. Miramontes was a methamphetamine user (though there was no testimony as much), the evidence does not establish that he was dangerous. Nor was any testimony offered establishing that Mr. Miramontes was a felon or had a violent history. Further, in this case there was no testimony that Mr. Miramontes himself had any weapons, or that any other firearms were found in the rest of the residence, despite the full search of the residence, including the search of Mr. Miramontes' room and the common areas. There was no testimony that Mr. Miramontes had access to Defendant's room, where the only firearms were found. Further, while the Government argues that Agent Acee testified that he was concerned

about the unfound firearm, he actually only stated as much in response to a leading question from the Government:

> Q:    On August 3rd, there was potentially an outstanding firearm unaccounted for because Mr. Warwick had a holster and no firearm.  Did you have any concerns about that?
> A: Yes.

[Doc. 75, 135:23 to 136:1]  The Court is not persuaded that this post hoc justification was considered by Agent Acee at the time he decided to conduct the protective sweep.  In sum, considering the totality of the circumstances of this case, the evidence of Mr. Warwick's prior gun possession and the general appearance of the residence as a "meth flop house" is insufficient to warrant a belief that Mr. Miramontes posed a danger to the officers on scene.  *See Hogan*, 38 F.3d at 1150 ("The fact that the officers had evidence that an accomplice was involved in the murder does not equate to evidence that some person would be hiding out in Hogan's house a month after the event and that officer safety was threatened"); *Carter*, 360 F.3d at 1242 (holding that "the government has pointed to no specific, articulable facts suggesting that the backyard or garage harbored anyone who posed a danger to them").

Arguably, the open door of the residence could invite an inference that, if someone was inside, and that someone was dangerous, that someone would be more immediately able to launch an attack at officers on the scene.  Again, however, what is lacking is reason to believe that someone in the home was dangerous.  Furthermore, the arrest scene was more than 30 feet from the front door and, from both GEX 48 and DEX 1 it appears that the arrest occurred at a location in which there would have been a sharp angle from

inside the open door to the area at which the arrest took place, making it impossible to hide far in the recesses of the trailer and shoot at the officers. Moreover, the open door also potentially contributed to officer safety. One or two officers could have stood guard at the open door of the residence to ensure officer safety, which would have struck reasonable balance between ensuring police safety and respecting the Fourth Amendment rights to be free from unreasonable, warrantless searches.

The Court must also address Agent Sainato's testimony that "a protective sweep . . . is customary in an arrest scenario." [GEX 49] Any policy by which officers enter a residence after a person is arrested outside that residence and conduct a search therein as a matter of course runs afoul of the Fourth Amendment. *Hauk*, 412 F.3d at 1186. The Court strongly advises the Government to ensure that its officers are properly trained on the limits of a protective sweep absent reasonable suspicion, which must be kept solely to "closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." *Buie*, 494 U.S. at 334-36. Reasonable suspicion is required for anything beyond those immediate areas. *Id.*

Accordingly, for the foregoing reasons, *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 33] is **GRANTED**.

**CONCLUSION**

For the foregoing reasons, the Court **HEREBY DENIES** *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 34] and the Court further **HEREBY GRANTS** *Defendant's Motion to Suppress Fruits of Illegal Search of Residence* [Doc. 33].

**SO ORDERED** this 30th day of August, 2017 in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge